# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCOTT R. PALMENTA,<br>    Plaintiff, | |
| | No. 3:18-cv-838 (SRU) |
| v. | |
| JEFFREY COVELLO, et al.,<br>    Defendants. | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

In this action, Scott R. Palmenta, procceding *pro se*, sues New Milford Police

Department ("NMPD") Officer Jeffrey Covello[1] in his individual capacity for money damages

pursuant to 42 U.S.C. § 1983.  *See* Am. Compl., Doc. No. 27, at 4–5.[2]  More specifically,

Palmenta claims that Covello falsely arrested him and unlawfully seized his vehicle in violation

of Palmenta's right under the Fourth Amendment to be free from unreasonable seizures.  *See*

Am. Compl., Doc. No. 27.  In June 2019, Officer Covello filed a motion for summary judgment,

arguing that he is shielded from liability on the basis of qualified immunity and, even if not, that

he did not violate Palmenta's rights under the Fourth Amendment.  *See* Mot. for Summ. J., Doc.

No. 52.  Almost a year—and several extensions of time[3]—later, Palmenta filed an opposition to

Officer Covello's motion for summary judgment.  *See* Palmenta's Opp'n, Doc. No. 79.  Also

pending is Palmenta's motion for appointment of *pro bono* counsel, which is Palmenta's sixth

such motion.  *See* Mot. to Appt. Counsel, Doc. No. 69; *see also* Ruling on Mot. to Appt.

Counsel, Doc. No. 64 (denying Palmenta's fifth motion to appoint counsel).  For the following

---

[1]  I refer to Covello as Officer Covello, although Covello left the NMPD in April 2019 and no longer works as a police officer.  Aff. of J. Covello, Ex. 2 to Mot. for Summ. J., Doc. No. 52-5, at ¶ 3.

[2]  Originally, in May 2018, Palmenta sued another NMPD Officer and the mayor of New Milford.  *See* Compl., Doc. No. 1.  However, the only claim that survived my initial review order in September 2018 was Palmenta's claim against Covello in his individual capacity.  *See* Initial Review Order, Doc. No. 21, at 3–6.

[3]  I have granted Palmenta four extensions of time.  *See* Orders, Doc. Nos. 54, 58, 63, 70.

reasons, Officer Covello's motion for summary judgment is **granted**, and Palmenta's motion to appoint counsel is **denied**.

### I.    Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

2

Regarding materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.  *Id.* at 247–48.  To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary judgment may enter.  *Celotex*, 477 U.S. at 323.

Although the court is required to read a self-represented party's papers liberally and interpret them to raise the strongest arguments that they suggest, "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment.  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000); *see also Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015).

## II.    Facts[4]

---

[4]  Officer Covello has submitted a Local Rule 56(a)1 statement of facts.  Palmenta did not file a Local Rule 56(a)2 statement of facts, but, in his opposition, Palmenta responded to Officer Covello's assertions of fact in the

On May 12, 2016, at approximately 6:18 p.m., the NMPD received a 911 call regarding

an interrupted burglary of a vehicle in the parking lot of Temple Sholom (a synagogue) located at

122 Kent Road in New Milford, Connecticut.  Def.'s Local Rule 56(a)1 Stmnt. ("56(a)1

Stmnt."), Doc. No. 52-2, at ¶ 1; Aff. of J. Covello, Ex. 2 to Mot. for Summ. J. ("Covello Aff."),

Doc. No. 52-5, at ¶ 4.  Officer Covello, then a NMPD Officer, was dispatched to the scene to

investigate.  *See* 56(a)1 Stmnt., Doc. No. 52-2, at ¶ 2; Covello Aff., Doc. No. 52-5, at ¶ 5.

After Officer Covello arrived at Temple Sholom (around 6:29 p.m.), he met with a

husband and wife.  *See* Covello Aff., Doc. No. 52-2, at ¶¶ 5–6.  The couple explained that they

had left their nine-year-old daughter sleeping in their parked car while they went inside Temple

Sholom.  *See id.* at ¶ 6.  The couple took frequent turns checking on their daughter.  *See id.*

When the husband checked on their daughter shortly before 6:18 p.m., he had observed an

unknown white male standing at the vehicle.  *See id.*  Officer Covello took a sworn,  written

witness statement from the husband, which read, in relevant part:

> My wife and I were inside the temple speaking with the Rabbi while our 9 year
> old daughter was sleeping in our vehicle directly outside the door to the temple
> entrance.  My wife and I checked on my daughter multiple times to ensure she
> was fine, and on the third time I arrived at the vehicle I discovered a vehicle
> parked directly alongside mine & between this vehicle, a white male was
> standing.  He was tall, skinny, with short white or greyish hair.  He appeared
> unkempt, with dirty pants and shirt, I believe tan in color pants, with a dark in
> color vest.  He had a scruff beard, and appeared weathered and worn.  The vehicle
> he was driving was a maroon color ford explorer, an older style that was very
> beaten up.  Both bumpers were messed up and interior visibly in disarray with
> much debris strewn about the vehicle.  I asked the man what he was doing and he
> replied "I'm making a phone call, I can't make a phone call?"  However, he did
> not have a phone in his hand when he said this.  He appeared to be clearly making
> this up, and quickly got into his vehicle and drove off.  Because he was facing
> into the temple he had to turn around in the lot and drive out.  As he drove out I
> observed him nervously looking at me as he passed.  His license plate appeared to

Rule 56(a)1 statement.  *See* Palmenta's Opp'n, Doc. No. 79, at 1–7.  I have reviewed the parties' submissions and
the entire record to determine what facts are undisputed.

be X1712V, and clearly an older style CT. registration plate.  As he arrived onto Kent Rd, he turned left toward the center of town.

56(a)1 Stmnt., Doc. No. 52-2, at ¶¶ 3–4, 6; Witness Stmnt., Ex. 4 to Mot. for Summ. J. ("Witness Stmnt."), Doc. No. 52-7, at 1–2.  The husband indicated further that his sleeping daughter was fine, but that his wife's purse was open; he looked inside, but he "wasn't sure of what was missing," so he called his wife to the car.  *See* Witness Stmnt., Doc. No. 52-7, at 2.  Ultimately, the husband was able to "account for the following missing from her purse":  "(1) Burberry wallet, approximate[] value [$]400.00, (2) several thousand in cash, approximately [$]2000.00[,] (3) CT. Driver[']s License . . . [,] (4) seven (7) credit cards (all in the name of [redacted]) and one (1) in the name of [redacted], and (5) misc. personal [e]ffects."  *Id.* at 2–3.

Later on May 12, 2016, someone from the NMPD ran a DMV database search for the license plate number that the husband had recounted:  X1712V.  *See* Covello Aff., Doc. No. 52-5, at ¶ 8.  There was no exact match.  *See id.*  However, the following day, Officer Covello requested that NMPD personnel run a search of similar license plates.  *See id.* at ¶ 9.  That search revealed that a similar plate—12CX17—was registered to a red 1999 Ford Explorer owned by Scott Palmenta of 382 Kent Road, New Milford, Connecticut.  *See id.*; 56(a)1 Stmnt., Doc. No. 52-2, at ¶ 7; Arrest Warrant Application, Ex. 3 to Mot. for Summ. J. ("Arrest Warrant Application"), Doc. No. 52-6, at ¶ 6.

Also on May 13, Officer Covello learned that Palmenta was on parole for a second-degree burglary conviction and that he was subject to continuous location monitoring by an ankle bracelet.  *See* 56(a)1 Stmnt., Doc. No. 52-2, at ¶ 8; Covello Aff., Doc. No. 52-5, at ¶¶ 10–11; Arrest Warrant Application, Doc. No. 52-6, at ¶¶ 7–8; Palmenta Dep. Tr., Ex. 3 to Mot. for Summ. J. ("Palmenta's Dep."), Doc. No. 52-4, at 13:8–14:19.  So, Officer Covello contacted

5

Palmenta's parole officer, who informed Officer Covello that GPS tracking data from Palmenta's ankle bracelet placed Palmenta in the Temple Sholom parking lot from 6:12 p.m. to 6:14 p.m. on May 12, 2016.  *See* 56(a)1 Stmnt., Doc. No. 52-2, at ¶ 9; Covello Aff., Doc. No. 52-5, at ¶ 11; Arrest Warrant Application, Doc. No. 52-6, at ¶ 8; GPS Tracking Data, Ex. 6 to Mot. for Summ. J. ("GPS Tracking Data"), Doc. No. 52-9.[5]

On May 13, 2016, at approximately 6 p.m., Officer Covello went to Palmenta's home in New Milford.  *See* 56(a)1 Stmnt., Doc. No. 52-2, at ¶ 8; Arrest Warrant Application, Doc. No. 52-6, at ¶ 9.  When Officer Covello arrived, he observed a red Ford Explorer in the driveway with the license plate 12CX17 and which appeared badly worn.  *See id.*  Officer Covello knocked on the door, and Palmenta answered.  *See* Arrest Warrant Application, Doc. No. 52-6, at ¶ 9. Palmenta was a white male with short blond hair who stood 5 feet 11 inches tall with a muscular build.[6]  56(a)1 Stmnt., Doc. No. 52-2, at ¶ 5; Palmenta's Opp'n, Doc. No. 79 at 1; NMPD Arrest Report, Ex. 8 to Mot. for Summ. J. ("NMPD Arrest Report"), Doc. No. 52-11; Palmenta's Dep., Doc. No. 52-4, at 24:17–25:18; Aff. of S. Palmenta, Ex. 1 to Palmenta's Opp'n ("Palmenta Aff."), Doc. No. 79-1 at ¶ 5.

Palmenta alleges that he cooperated with Officer Covello, who, Palmenta says, "threatened [Palmenta] with several years in prison if [Palmenta did not] admit to a crime he

---

[5] Palmenta disputes that the GPS tracking data indicates that he was in the parking lot of Temple Sholom. *See* Aff. of S. Palmenta, Ex. 1 to Palmenta's Opp'n, Doc. No. 79-1 at ¶ 3.  However, the longitudinal and latitudinal GPS tracking data certainly indicate that Palmenta was in the parking lot of Temple Sholom.  The GPS tracking data returned latitudinal and longitudinal readings, in relevant part, at 6:13:05 p.m., 6:14:05 p.m., and 6:15:05 p.m. Those readings were, respectively: (1) (41.581417 -73.427650); (2) (41.581400 -73.427717); and (3) (41.581300 -73.428117).  *See* GPS Tracking, Doc. No. 52-9, at 5.  Each of those readings describes a location in the Temple Sholom parking lot.  *See,* Location, GOOGLE MAPS, https://www.google.com/maps (last visited May 28, 2020) (enter coordinates above into search bar).

[6] The NMPD Arrest Report indicates that Palmenta weighed 180 pounds.  *See* NMPD Arrest Report, Doc. No. 52-11, at 1.  However, Palmenta maintains that he has not weighed "below 190 lbs in several years." Palmenta's Opp'n, Doc. No. 79, at 1.

never" committed.  Am. Compl., Doc. No. 27, at ¶ 1; Answer, Doc. No. 32, at ¶ 1 (denying that

claim).  Officer Covello informed Palmenta—and Palmenta's attorney, whom Palmenta had

called and who spoke with Officer Covello over the phone—that Palmenta's Ford Explorer

would be seized and towed immediately because there was probable cause to believe it had been

used to commit a crime and contained evidence of that crime.  *See* Am. Compl., Doc. No. 27, at

¶¶ 4–5; Answer, Doc. No. 32, at ¶¶ 4–5; Arrest Warrant Application, Doc. No. 52-6, at ¶ 9.  So,

Palmenta's 1999 Ford Explorer was towed to the NMPD.  *See* Palmenta's Dep., Doc. No. 52-4,

at 12:8–11, 41:17–42:5; Arrest Warrant Application, Doc. No. 52-6, at ¶ 9; NMPD Arrest

Report, Doc. No. 52-11, at 3.

On May 18, 2016, Officer Covello submitted an application for an arrest warrant to the

Connecticut Superior Court.  *See* Arrest Warrant Application, Doc. No. 52-6.  In the arrest

warrant application, Officer Covello represented that, on the evening of May 12, a

> 911 caller requested police respond to the Temple Sh[o]lom, to investigate a male,
> white, with short hair, "buzz cut", driving a red Ford SUV, bearing Connecticut
> registration "X1712V", which he described as an older style Explorer model, "all
> beat up", had just taken his wife's purse from his vehicle parked outside the
> Temple.

Arrest Warrant Application, Doc. No. 52-6, at ¶ 3.  After explaining that the witness had

provided a sworn, written statement, Officer Covello then relayed information included in that

witness statement, sometimes verbatim but sometimes paraphrased.  Officer Covello included

information about the suspect, his vehicle, and his license plate (including the witness's

reference to the vehicle's color as maroon).  Officer Covello also mentioned that the items

stolen included a wallet valued at $400, "several thousand dollars in U.S. currency," seven

credit cards, and a driver's license.  *See* 56(a)1 Stmnt., Doc. No. 52-2, at ¶ 11; Arrest Warrant

Application, Doc. No. 52-6, at ¶ 5.

      The arrest warrant application noted that a similar license plate search identified a

license plate of 12CX17 (rather than X1712V identified by the witness) registered to a red 1999

Ford Explorer owned by Palmenta.  *See* Arrest Warrant Application, Doc. No. 52-6, at ¶ 6.  The

arrest warrant application also explained that Palmenta, as a supervised person, was being

monitored by an ankle bracelet; on May 13, 2016, Palmenta's probation officer provided

Officer Covello with GPS data that indicated Palmenta was on the property of Temple Sholom

on May 12 "at 18:12 hours, until 18:14 hours."  *Id.* at ¶ 8.  The arrest warrant application

described Officer Covello's interaction with Palmenta at his residence on May 13, 2016 and

Officer Covello's observations of Palmenta's red Ford Explorer, which "was noticeabl[y] a

dated model and had much body rust, rot, and [was] packed with miscellaneous [e]ffects

inside."  *Id.* at ¶ 9; *see also* Photographs of Palmenta's Vehicle, Ex. 5 to Mot. for Summ. J.,

Doc. No. 52-8.  The arrest warrant application also explained that Palmenta's vehicle had been

seized and transported to the NMPD, where it was secured in a locked impound facility.  Arrest

Warrant Application, Doc. No. 52-6, at ¶ 9.  On May 19, 2016, Judge Matasavage signed the

arrest warrant application.  *See* 56(a)1 Stmnt., Doc. No. 52-2, at ¶ 12; Arrest Warrant

Application, Doc. No. 52-6.

      Officer Covello represents that on May 20, 2016, he received a voice mail from the

victim in this case (the wife).  That voice mail indicated that her wallet had been found outside

Temple Sholom.  On May 22, Officer Covello spoke with the victim, and she confirmed that

her wallet had been found and that none of its contents—including $1,365 in cash—was

missing.  Covello Aff., Doc No. 52-5, at ¶¶ 14–15; NMPD Initial Report, Ex. 7 to Mot. for

Summ. J., Doc. No. 52-10, at 4.  Officer Covello also avers that he "subsequently learned" that

Palmenta's "GPS tracker had tracked him to the vicinity of the Temple Sh[o]lom again in the

evening of May 13, 2016," after Officer Covello had left Palmenta's residence.  Covello Aff.,

Doc No. 52-5, at ¶ 16.

On May 22, 2016, Palmenta was arrested for burglary in the third degree, in violation of

Conn. Gen. Stat. § 53a-103,[7] and larceny in the third degree, in violation of Conn. Gen. Stat. §

53a-124.[8]  *See* NMPD Arrest Report, Doc. No. 52-11.

Palmenta asserts that in July 2016 he participated in an in-person police lineup and that

he was not selected, which cleared him from the charges of burglary and larceny underlying this

case.  *See* Am. Compl., Doc. No. 27, at ¶ 8; Answer, Doc. No. 32, at ¶ 8 (denying that claim).

According to Palmenta, the underlying criminal case was dismissed on July 29, 2016.  *See* Am.

Compl., Doc. No. 27, at ¶ 5; Answer, Doc. No. 32, at ¶ 5 (denying that claim).  However, also

according to Palmenta, Palmenta was detained until September 15, 2016, while awaiting his

parole hearing.  *See* Am. Compl., Doc. No. 27, at ¶ 5; Answer, Doc. No. 32, at ¶ 5 (denying that

claim).

## III.        Discussion

---

[7] The arrest warrant application references a section 53a-103m, but no such statute exists.  *See* Arrest Warrant Application, Doc. No. 52-6, at ¶ 10.  In contrast, the arrest report indicates that Palmenta was arrested for violating "53A-103[M]" for "Burglary 3rd – From a Motor Vehicle."  *See* NMPD Arrest Report, Doc. No. 52-11, at 2.  It seems likely that the "m" simply indicates that the burglary was from a motor vehicle.  That conclusion is buttressed by the broad language of section 53a-103, which provides that a "person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."  Conn. Gen. Stat. § 53a-103.  A "[b]uilding" is statutorily defined as "in addition to its ordinary meaning, . . . any watercraft, aircraft, trailer, sleeping car, railroad car or other structure or vehicle or any building with a valid certificate of occupancy." Conn. Gen. Stat. § 53a-100.
[8] Section 53a-124 provides that "(a) A person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a-119, and . . . the value of the property or service exceeds two thousand dollars[.]"

9

Palmenta alleges that Officer Covello violated his right under the Fourth Amendment to be free from unreasonable seizures by (1) unlawfully seizing Palmenta's vehicle by having that vehicle towed on May 13, 2016 and (2) falsely arresting Palmenta by omitting certain information from the arrest warrant application in this case. *See* Initial Review Order, Doc. No. 21, at 3–4, 6; Am. Compl., Doc. No. 27, at ¶¶ 5–7. Officer Covello maintains that he is entitled to qualified immunity and that, in any event, he did not violate Palmenta's rights under the Fourth Amendment. *See* Mem. in Support of Mot. for Summ. J., Doc. No. 52-1, at 3–13. I agree with Officer Covello that he is entitled to qualified immunity from Palmenta's claims.

A. The Law on Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

A right is clearly established if "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))

10

(alterations omitted).  A right can be "clearly established" even without a "case directly on point" having established that right, but existing precedent must have placed the statutory or constitutional question beyond debate.  *Id.*  Even when a right is clearly established, qualified immunity protects government officials when it was objectively reasonable for them to believe that their conduct in the particular factual context at issue did not violate that clearly established right.  *See Manganiello v. City of New York,* 612 F.3d 149, 165 (2d Cir. 2010).  "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).  I have discretion to determine the order in which I will address the above two inquiries (clearly established right and objective reasonableness).  *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (citing *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)).

      B.  <u>The Towing</u>

    The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV; *see also Terry v. Ohio,* 392 U.S. 1, 9 (1968) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.") (internal quotation marks and citation omitted).  The touchstone of the Fourth Amendment is reasonableness.  *See United States v. Knights*, 534 U.S. 112, 118 (2001).  The Fourth Amendment protects against unreasonable seizures of property.  *See Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 62 (1992).  "A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'"  *Id.* at 61 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  "To determine whether a seizure is unreasonable, a court must balance the nature and

11

quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine whether the totality of the circumstances justified the particular sort of seizure." *Carroll v. Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (internal quotation marks, citations, and alterations omitted).

Normally, a government official must obtain a warrant, issued by a judicial officer upon probable cause, to search or seize a person's property. *See, e.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 449 (1971). However, there are several exceptions to that warrant requirement. Two are applicable here: (1) the automobile exception and, relatedly, (2) exigent circumstances. Pursuant to the automobile exception, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007). Indeed, one of the underlying rationales of the automobile exception is that "because a vehicle is readily movable, exigent circumstances might require a warrantless search." *Id.* (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)); *see also Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (highlighting the "exigent circumstances that exist in connection with movable vehicles" because "the opportunity to search is fleeting since a car is readily movable," which "is strikingly true when the automobile's owner is alerted to police intentions and, as a consequence, the motivation to remove evidence from official grasp is heightened") (citing *Chambers v. Maroney*, 399 U.S. 42, 51 (1970)). Put differently, "[w]here law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant," the law enforcement authority may seize "the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other

12

recognized exception to the warrant requirement is present." *United States v. Place*, 462 U.S. 696, 701 (1983).

Probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232–33 (1983).  Whether probable cause exists must be evaluated by taking into account the totality of the circumstances.  *See id.* at 234; *see also Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007).  The probable cause determination is objective; it should be made without regard to the officer's subjective motives or belief regarding the existence of probable cause.  *Barnett v. City of Yonkers*, 2018 WL 4680026, at *7 (S.D.N.Y. Sept. 28, 2018).  Probable cause may exist where an officer has mistaken information, so long as it was reasonable for the officer to rely on the information.  *See Mistretta v. Prokesch,* 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998).

A vehicle impoundment must be supported by probable cause if undertaken for investigatory purposes.  *See Harper v. Town of Newburgh*, 2020 WL 1140858, at *13 (S.D.N.Y. Mar. 6, 2020) (citing *South Dakota v. Opperman*, 428 U.S. 364, 368, 370 n.5 (1976)).  "[W]hether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case."  *United States v. Lyle*, 919 F.3d 716, 731 (2d Cir. 2019).

Palmenta claims that Officer Covello's decision to tow the Ford Explorer on May 13, 2016 violated his rights under the Fourth Amendment.  More specifically, Palmenta claims that Officer Covello lacked probable cause to seize the Ford Explorer.  Palmenta points to discrepancies between the husband's descriptions in the witness statement and the actual

appearances of: (1) Palmenta himself and (2) the Ford Explorer.  *See* Palmenta's Opp'n, Doc. No. 79, at 1–2.

Taking into consideration the totality of the circumstances, Officer Covello had probable cause to believe that the Ford Explorer he saw at Palmenta's address on May 13, 2016 contained evidence of a crime.  Put simply, Officer Covello had substantial evidence that the red Ford Explorer in Palmenta's driveway had been used to commit burglary and larceny the day before and that thousands of dollars of the victim's property, or other evidence of the crime, might be inside.  The witness had described the make of the car the suspect was driving as a Ford Explorer, and the car in the driveway was a Ford Explorer.  The Ford Explorer in the driveway was red, and the witness had reported the car used in the burglary as "maroon."  The Ford Explorer in the driveway appeared old and beat up, which is just as the witness reported the Ford Explorer used the day before.  The Ford Explorer in the driveway had a license plate that contained five of the six characters that the witness had recalled from the vehicle used in the burglary.  Finally, DMV records indicated that the Ford Explorer used in the burglary was owned by Palmenta, who had been traced to the scene of the crime by GPS location monitoring.

Palmenta's attempts to point out small discrepancies do not change the analysis. Palmenta first focuses on the witness's description of Palmenta.  In the witness statement, the witness described the suspect as "tall, skinny, with short white or greyish hair."  Witness Stmnt., Doc. No. 52-7, at 1.  However, Palmenta points out, he had blond (or strawberry-blond) hair, was 5 feet 11 inches tall, wore glasses, weighed at least 180 pounds, and was muscular in build.  *See* NMPD Arrest Report, Doc. No. 52-11.  But the witness's description of the suspect and Palmenta's description of himself are not strikingly dissimilar.  Further, Officer Covello knew

14

that the witness's interaction with the suspect in the Temple Sholom parking lot lasted only a short time.  Thus, it is not surprising that the witness may have failed to accurately identify every attribute of Palmenta's appearance, including his glasses (if Palmenta was indeed wearing glasses at the time) or the exact color of his hair.  Finally, whether a 5-foot-11-inch man who weighs 180 pounds is "tall," "skinny," or "muscular" depends largely upon the observer's subjective understanding of those characteristics.

Palmenta next focuses on the witness's description of the vehicle involved in the burglary.  Recall that the witness had described that vehicle as "a maroon color ford explorer, an older style that was very beaten up," and that "[b]oth bumpers were messed up and interior visibly in disarray with much debris strewn about the vehicle."   Witness Stmnt., Doc. No. 52-7, at 2.  The witness also wrote that the "license plate appeared to be X1712V."  *Id.*  Palmenta asserts that his Ford Explorer is light red in color, his bumpers are in good shape, and his vehicle was "clean and empty always."  *See* Palmenta's Opp'n, Doc. No. 79, at 2; Palmenta Aff., Doc. No. 79-1 at ¶ 5.  None of Palmenta's arguments is persuasive.  Regarding the Ford Explorer's color, Palmenta hardly raises an issue.  Maroon is "a dark red."  Maroon, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2000).  The photographic evidence submitted by both parties shows that the Ford Explorer was red.  *See* Photographs of Palmenta's Vehicle, Doc. No. 52-8; Palmenta's Opp'n, Doc. No. 79, at 10.  Palmenta may consider the color "light red," but a reasonable person could also consider it "maroon."  And, given the totality of the circumstances, any minute difference in the Ford Explorer's shade of red is quite inconsequential.  Regarding the description of the Ford Explorer's bumpers, the photographs of the vehicle clearly depict a discoloration on the back bumper that appears to be rust or other damage.  Photographs of

15

Palmenta's Vehicle, Doc. No. 52-8; Palmenta's Opp'n, Doc. No. 79, at 10.  Although difficult to discern due to the lighting of the photographs, the front bumper on the passenger also side appears to have some rust-colored discoloration.  *Id.*  And the car is plainly an older model Ford.

Palmenta also highlights his Ford Explorer's tinted windows.  Recall that the witness stated that the vehicle's "interior [was] visibly in disarray with much debris strewn about the vehicle."  *See* Witness Stmnt., Doc. No. 52-7, at 2.  Palmenta, though, questions how the witness could have observed the vehicle's interior given the fact that his Ford Explorer had dark tinted windows.  *See* Palmenta's Opp'n, Doc. No. 79, at 2.  That observation, too, does not help Palmenta.  First, there is no evidence that the windows were up on the vehicle involved in the burglary.  If they were not, the windows' tint would be irrelevant.  Second, even if the windows were up, the witness could have seen into the vehicle when Palmenta opened the vehicle door as he prepared to leave.  Finally, the photographs submitted in this case do show that Palmenta's Ford Explorer had relatively dark windows; but they also make clear that one can see inside the windows, at least the windshield and front windows on both the passenger and driver side.  *See* Photographs of Palmenta's Vehicle, Doc. No. 52-8; Palmenta's Opp'n, Doc. No. 79, at 10.

Palmenta's complaint (although not his opposition) also raises concerns about the differences between the license plate number identified by the witness (X1712V) and the actual license plate number (12CX17) on the Ford Explorer registered to Palmenta.  However, the license plate number provided by the witness was sufficiently similar to the license plate number on Palmenta's Ford Explorer that the latter turned up in a search for plate numbers similar to the former.  Indeed, five of the six characters in the two license plates are the same.  Given the similarity observed between the older model Ford Explorer described by the witness and the

1999 Ford Explorer registered to Palmenta—coupled with the GPS data indicating Palmenta's location at the Temple Sholom at the time of the incident—it was reasonable for Officer Covello to believe that Palmenta had used the Ford Explorer in connection with the reported burglary at Temple Sholom on May 12, 2016.

The discrepancies that Palmenta attempts to highlight do not undermine Officer Covello's determination that he had probable cause to tow the Ford Explorer on May 13, 2016. Through GPS location data, Officer Covello had already learned that Palmenta had been in the parking lot of Temple Sholom at the time of the burglary the day before.  Officer Covello also learned from DMV records that a red 1999 Ford Explorer—which corresponded to the "maroon" Ford Explorer the witness identified—was registered to Palmenta.  The license plate numbers between Palmenta's Ford Explorer and the one allegedly used in the burglary were strikingly similar.  Then, when Officer Covello arrived at Palmenta's home and spoke with Palmenta, Officer Covello observed Palmenta's red Ford Explorer in his driveway and further noted that its appearance—and Palmenta's appearance—reasonably corresponded to the witness's description.

At that point, Officer Covello might have gone to a judicial officer and applied for a search warrant to search Palmenta's red Ford Explorer.  Perhaps another officer would have. But, the Second Circuit and Supreme Court have repeatedly acknowledged the automobile exception to the warrant requirement based in large part on the fear that, due to the inherent mobility of automobiles, evidence can disappear.  *See, e.g.*, *Cardwell*, 417 U.S. at 590; *Howard*, 489 F.3d at 492.  It was reasonable for Officer Covello to believe that such exigent circumstances existed, particularly because Palmenta had now been alerted to the fact that Officer Covello suspected his involvement with the burglary.  Thus, Officer Covello's decision

17

to tow Palmenta's Ford Explorer without a warrant based on probable cause that the car contained evidence of a crime was objectively reasonable. *See Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) ("[S]ummary judgment is appropriate when a trier of fact would find that reasonable officers could disagree."). For that reason, Officer Covello is entitled to qualified immunity from suit on this claim.

### C. False Arrest

Palmenta has a clearly established right to be free from arrest without probable cause. *See Lennon*, 66 F.3d at 423. A plaintiff seeking to recover for false arrest under section 1983 must establish that "(1) the defendant intentionally arrested him or had him arrested, (2) the plaintiff was aware of the arrest, (3) there was no consent to the arrest, and (4) the arrest was not supported by probable cause." *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 246 (D. Conn. 2003). "[T]he existence of probable cause is a complete defense to a claim alleging false arrest or malicious prosecution." *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 449 (D. Conn. 2002); *see also Fernandez-Bravo v. Town of Manchester*, 711 F. App'x 5, 7 (2d Cir. 2017) (summary order) (holding no claim for false arrest or malicious prosecution where arresting officer had probable cause to arrest plaintiff). In the context of a false arrest claim, the probable cause inquiry can also be dispositive of the qualified immunity inquiry because, if probable cause *did* exist for the plaintiff's arrest, then no clearly established right was violated (because there is no right not to be arrested when probable cause exists). *See Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017); *Weinstock*, 296 F. Supp. 2d at 248 n.6; *Gasparri*, 193 F. Supp. 2d at 449–50.

Generally, probable cause to arrest exists when the officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of

18

reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 851 (2d Cir. 1996); *see also Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007). An arrest made pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause. *Walczyk*, 496 F.3d at 155–56; *Ganek*, 874 F.3d at 81. A plaintiff may defeat that presumption by showing that the defendant officer "(1) knowingly and deliberately, or with a reckless disregard of the truth, procured the warrant, (2) based on false statements or material omissions, that (3) were necessary to the finding of probable cause." *Id.* (quoting *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994)) (internal quotation marks omitted); *see also Soares v. State of Conn.*, 8 F.3d 917, 920 (2d Cir. 1993) (citing *Golino v. City of New Haven,* 950 F.2d 864, 870–71 (2d Cir. 1991)). "Recklessness may be inferred where the omitted information was clearly critical to the probable cause determination." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (internal quotation marks and citations omitted).

In this inquiry, I must "put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *See Soares*, 8 F.3d at 920. Thus, I "consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek*, 874 F.3d at 82; *Soares*, 8 F.3d at 920. "If probable cause is lacking after such correction, then the false statement was 'necessary' to secure issuance of the warrant." *Ganek*, 874 F.3d at 82. However, "if probable cause remains" after the hypothetical correction, there is "no violation of Fourth Amendment

19

rights."[9]  *Id.*  "[Q]ualified immunity is appropriate if the affidavit accompanying the warrant is

sufficient, after correcting for material misstatements or omissions, to support a reasonable

officer's belief that probable cause existed."  *Magnotti v. Kuntz*, 918 F.2d 364, 368 (2d Cir.

1990).

Palmenta complains that Officer Covello omitted important information from his arrest

warrant application.  Specifically, Palmenta claims that Officer Covello failed to inform the court

that (1) there were discrepancies between the witness's description of the suspect and Palmenta's

true physical characteristics; (2) there were discrepancies between the witness's description of

the suspect's vehicle and Palmenta's Ford Explorer; (3) the allegedly stolen wallet was later

found with nothing lost; (4) Officer Covello "falsified the amount of the alleged larceny to make

it a felony arrest"; and (5) the GPS location data indicated that Palmenta was moving 38 miles

per hour at 6:12 p.m. and 14 miles per hour at 6:15 p.m.  *See* Am. Compl., Doc. No. 27, at ¶¶ 6–

7; Palmenta Aff., Doc. No. 79-1, at ¶¶ 3, 5.

So, I consider a hypothetical corrected affidavit that would include the above

information.  That affidavit would set forth that Palmenta was a white male, 5 feet 11 inches tall,

had a muscular build, had short, blond hair, and wore glasses.  At the same time, the affidavit

would have included the witness's statement, which described the suspect as a "tall, skinny,"

white male "with short white or greyish hair."  *See* Witness Stmnt., Doc. No. 52-7, at 1.  With

respect to the vehicle, the affidavit would provide information about Palmenta's "light red" Ford

Explorer, which has dark windows and some damage showing on its bumpers.  Of course, the

---

[9]  Whether information omitted from an affidavit is relevant to the probable cause determination is a question of law for the court.  *See Walczyk*, 496 F.3d at 157–58.  If the court determines information is relevant, then a question of fact may arise as to the weight that the judge would "likely have given such information, and whether defendant[] acted deliberately or recklessly in omitting the information from the warrant affidavits."  *Id.* at 158.

affidavit would still relay the witness's description of the suspect's vehicle as a maroon Ford Explorer of "an older style that was very beaten up," with both bumpers "messed up" and an "interior visibly in disarray with much debris strewn about the vehicle."  *See* Witness Stmnt., Doc. No. 52-7, at 2.

The hypothetical affidavit would also more precisely track the witness's account of how much money was stolen.  As it was, Officer Covello wrote that the stolen items included a wallet valued at $400, "several thousand dollars in U.S. currency," seven credit cards, and a driver's license.  *See* Arrest Warrant Application, Doc. No. 52-6, at ¶ 5.  The witness's statement referred to the amount of currency stolen as "several thousand in cash, approximately [$]2000.00." Witness Stmnt., Doc. No. 52-7, at 2.  The hypothetical corrected affidavit would have informed the court that the items stolen consisted of a Burberry wallet, valued at approximately $400.00, "several thousand in cash, approximately $2,000," a driver's license, and seven credit cards.  *See* Witness Stmnt., Doc. No. 52-7.

Although Palmenta claims that Officer Covello should have alerted the court to the fact that the wallet was later found and returned to the victim, Officer Covello could not have done so.  That is because Officer Covello swears that he learned about the wallet's being recovered in a voicemail from the victim on May 20, 2016, one day after Judge Matasavage signed the arrest warrant.  *See* Covello Aff., Doc. No. 52-5, at ¶ 14.  Officer Covello also avers that he spoke to the victim on May 22, when she informed Officer Covello that the wallet's contents were intact, including $1,350 in cash.  *See id.* at ¶ 15.  There is no evidence in the record that draws that timeline into question.  Thus, I conclude that Officer Covello did not know about the wallet's recovery when he submitted the arrest warrant application.  However, as described below, even

if that information were taken into account—along with the relevant information that Palmenta's GPS tracking data indicated that Palmenta had returned to the vicinity of Temple Sholom in the late evening of May 13, 2016, *see* Covello Aff., Doc. No. 52-2, at ¶ 16—it would not change the overall analysis.

Finally, the hypothetical corrected affidavit might also include more full GPS location data from Palmenta's ankle bracelet at the time of the crime.  As described above, the readings from Palmenta's ankle bracelet at 6:13:05 p.m., 6:14:05 p.m., and 6:15:05 p.m. all place him in the parking lot of Temple Sholom.  *See supra* n.5; GPS Tracking, Doc. No. 52-9, at 5.  Palmenta, though, claims that the GPS tracking data is helpful to him because at 6:12:05 p.m. he was moving at 38 miles per hour and that at 6:15:05 p.m. he was moving at 14 miles per hour.  *See* Palmenta Aff., Doc. No. 79-1, at ¶ 3; GPS Tracking, Doc. No. 52-9, at 5.  That information would be included in a hypothetical affidavit.

Had the arrest warrant application in this case included all the information that Palmenta identifies, a reasonable officer still could conclude that probable cause existed for Palmenta's arrest for violations of Conn. Gen. Stat. §§ 53a-103 (burglary in the third degree) and 53a-124 (larceny in the third degree).  The hypothetical affidavit would have included:  (1) GPS tracking data reflecting Palmenta's location at the Temple Sholom parking lot at the time of the crime; (2) the witness's identification of a license plate extremely similar to the license plate for the Ford Explorer registered to Palmenta; (3) the witness's descriptions of the suspect's vehicle that reasonably corresponded to Palmenta's Ford Explorer; (4) the witness's description of the suspect that reasonably corresponded to Palmenta's physical appearance; and (5) the value of stolen property being at least $2,400 ($2,000 in currency and a wallet worth $400).  No evidence

suggests that Officer Covello acted with a knowing or reckless disregard of the truth in submitting the arrest warrant application to the court.  Thus, based on the totality of the circumstances, a reasonable officer could have believed that probable cause existed for Palmenta's arrest, and so Officer Covello is entitled to qualified immunity from Palmenta's false arrest claim.

> D.   Appointment of Counsel

Because I have determined that Officer Covello is entitled to summary judgment on Palmenta's claims, this case will not proceed, and so I deny Palmenta's motion to appoint counsel.  *See Hodge v. Police Officers*, 802 F.2d 58, 60–61 (2d Cir. 1986) (district judges are afforded "[b]road discretion" in determining whether to appoint *pro bono* counsel for an indigent litigant in a civil case but should "first determine whether the indigent's position seems likely to be of substance").

## IV.   Discussion

Officer Covello's motion for summary judgment, doc. no. 52, is **granted**.  Palmenta's motion to appoint counsel, doc. no. 69, is **denied**.  The clerk is instructed to enter judgment for the defendant and close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 28th day of May 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

23